Robert F. Brennan, Esq. [S.B. #132449]
**LAW OFFICES OF ROBERT F. BRENNAN, A P.C.**
3150 Montrose Ave.
La Crescenta, CA 91214
Tel. (818) 249-5291
Fax (818) 249-4329
Email: rbrennan@brennanlaw.com

Attorney for Plaintiff
FRED J. PETERS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRED J. PETERS,<br><br>              Plaintiff,<br><br>      vs.<br><br>EQUIFAX INFORMATION<br>SERVICES LLC, et al.,<br><br>              Defendants. | Case No.: EDCV 12-01837-TJH(OP)<br>Hon. Terry J. Hatter, Jr.<br>Courtroom 17<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT DISCOVER BANK'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>[Filed concurrently with: Plaintiff's Statement of Genuine Disputes; and Declarations of Fred J. Peters, Mary Peters, Thomas Tarter and Robert F. Brennan, with Exhibits.]<br><br>Date:   Nov. 25, 2013<br>Time:  Under submission<br>Courtroom: 17 |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................1

II. STATEMENT OF FACTS.................................................................................2

III. ARGUMENT.....................................................................................................15

    A. STANDARD FOR SUMMARY JUDGMENT.........................................15

    B. QUESTIONS OF FACT PRECLUDE SUMMARY ADJUDICATION
    OF PLAINTIFF'S FIRST CAUSE OF ACTION FOR VIOLATION
    OF THE FCRA.................................................................................................15

        1. Discover Failed to Conduct a Reasonable Investigation
        as Required by the FCRA........................................................................17

        2. Discover Reported Inaccurate Information.......................................18

    C. QUESTIONS OF FACT PRECLUDE SUMMARY ADJUDICATION
    OF PLAINTIFF'S FOURTH CAUSE OF ACTION FOR VIOLATION
    OF THE CCRAA...............................................................................................18

    D. QUESTIONS OF FACT PRECLUDE SUMMARY ADJUDICATION
    OF PLAINTIFF'S SECOND AND THIRD CAUSES OF ACTION FOR
    VIOLATION OF THE IDENTITY THEFT LAW AND ROSENTHAL.
    THE APPLICABLE PROVISIONS OF THESE STATUTES ARE NOT
    PREEMPTED BY THE FCRA.........................................................................19

    E. DEFENDANT'S ESTOPPEL ARGUMENT FAILS..................................22

    F. PLAINTIFF HAS RECOVERABLE DAMAGES.......................................23

IV. CONCLUSION.................................................................................................25

///

///

///

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Aklagi v. Nationscredit Financial Services Corp.*, 196 F.Supp.2d 1186
(D. Kan. 2002)...................................................................................23

*Asher v. Chase Bank United States, N.A.*, 310 Fed. Appx. 912,
2009 WL 465083 (7th Cir. Ill. 2009)....................................................22

*Associated Press v. United States*, 326 U.S. 1, 89 L.Ed. 2013,
65 S.Ct. 1416 (1945)..........................................................................15

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548,
91 L.Ed.2d 265 (1986).......................................................................15

*Chiang v. Verizon New England, Inc.*, 595 F.3d 26 (1st Cir. Mass. 2010).........17, 18

*Cisneros v. U.D. Registry, Inc.*, 39 Cal.App.4th 548 (2nd Dist. 1995)...............20, 21

*Collins v. BAC Home Loans Servicing LP*, 912 F.Supp.2d 997
(D. Colo. 2012)..................................................................................18

*DBI Architects, P.C. v. American Express Travel-Related Services Co.*,
388 F.3d 886 (D.C. Cir. 2004).............................................................22

*Gomon v. TRW, Inc.*, 28 Cal.App.4th 1161 (4th Dist. 1994)......................................21

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. Cal. 2009).............17

*Johnson v. MBNA America Bank, N.A.*, 357 F.3d 426 (4th Cir. Va. 2004)...............17

*King v. Asset Acceptance, LLC*, 452 F.Supp.2d 1272 (N.D. Ga. 2006)..............17, 18

*Mathy v. Chase Manhattan Bank, USA*, 2009 U.S. Dist. LEXIS 100373,
2009 WL 3489398 (C.D. Cal. Oct. 26, 2009).........................................22, 23

*Minskoff v. American Express Travel Related Servs. Co.*, 98 F.3d 703
(2nd Cir. N.Y. 1996).........................................................................16, 22

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*Nelson v. Equifax Information Services, LLC*, 522 F.Supp.2d 1222
(C.D. Cal. 2007)...................................................................................23

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146,
91 L.Ed. 1447 (1947)...........................................................................20

*Sanai v. Saltz*, 170 Cal.App.4th 746 (2nd Dist. 2009)................................20

*Stroud v. Bank of America*, 886 F.Supp.2d 1308 (S.D. Fla. 2012)......................17, 18

## Statutes

15 U.S.C. § 1601 et seq............................................................................16

15 U.S.C. § 1666 et seq............................................................................22

15 U.S.C. § 1666(a)..................................................................................22

15 U.S.C. § 1666(b)..................................................................................22

15 U.S.C. § 1666j(a).................................................................................22

15 U.S.C. § 1681 et seq..............................................................................2

15 U.S.C. § 1681s-2(a)..............................................................................19

15 U.S.C. § 1681s-2(a)(1)(D)..................................................................18, 19

15 U.S.C. § 1681s-2(b)..............................................................................17

15 U.S.C. § 1681t(a)..................................................................................20

*Civil Code* § 1785 et seq.............................................................................2

*Civil Code* § 1785.25(a).............................................................................18

*Civil Code* § 1788.2(c)..........................................................................21, 22

*Civil Code* § 1788.18...........................................................................2, 19, 20

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*Civil Code* § 1798.92 et seq...................................................................................2

*Civil Code* § 1798.93.............................................................................................20

## **<u>Rules</u>**

Fed. R. Civ. P. 56(a)...............................................................................................15

///

///

///

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES
## I. INTRODUCTION

Defendant Discover Bank's Statement of Uncontroverted Facts ("SUF") contains 49 facts. Plaintiff Fred Peters disputes all but four of them which are inconsequential. (Plaintiff's Statement of Genuine Disputes ("Genuine Disputes"), Part I, Plaintiff's responses to Defendant's SUF Nos. 1, 7, 8 & 14 undisputed.) In addition, Plaintiff offers an additional 50 facts establishing questions of fact. (Genuine Disputes, Part II, pp. 28 – 41. These 50 facts are repeated verbatim in the Statement of Facts below.)[1]

Defendant's motion for summary judgment, or alternatively, partial summary judgment, should be denied because either the facts are clearly in Plaintiff's favor or there are genuine questions of fact. Plaintiff supports this opposition with various deposition transcripts, documents and three declarations: Plaintiff's expert witness – Thomas Tarter; Plaintiff Fred Peters; and Plaintiff's wife, Mary Peters. The evidence presented here establishes that:

(1) Mr. Peters was the victim of a sophisticated identity theft that would have been very difficult to detect;

(2) Discover never reconciled his account and never presented an accurate bill to the Peters following the identity theft;

(3) Discover added charges which it knew to be identity theft charges back onto Plaintiff's credit card, after it had taken them off, and then continued to charge penalties and interest on the identity theft charges;

(4) Discover credit-reported the Peters for late payments when Discover told the Peters not to make payments because an identity theft investigation was ongoing;

(5) Discover's credit reports were erroneous on their face;

(6) Discover's reinvestigation was seriously flawed, and its handling of this account in general was well beneath the industry standard;

---

[1] The facts in Part II of Plaintiff's accompanying Genuine Disputes, repeated in the Statement of Facts, will be referred to herein as "Plaintiff's Facts " and "Plf. Fact Nos."

1

(7) Plaintiff does not owe Discover for any of the legitimate charges he made on the card; Discover owes Plaintiff because Discover has failed to subtract out all of the identity theft charges and the interest, penalties and late charges which accrued on the identity theft charges; and

(8) Mr. Peters suffered both economic and non-economic damages as a consequence of Discover's utter mishandling of his account and the credit-reporting of his account.

A detailed discussion of these eight topics, with supporting evidence, is set forth in the Statement of Facts below. As discussed herein, Defendant is not entitled to summary judgment, or partial summary judgment, based on any issue of law, and there should be no doubt that Defendant's motion should be denied in its entirety based on the facts presented.

## II. STATEMENT OF FACTS

In this action, Plaintiff Fred Peters alleges four causes of action against Discover Bank for violations of: (1) the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.; (2) the California Consumer Credit Reporting Agencies Act ("CCRAA"), *Civil Code* § 1785 et seq.; (3) the California Identity Theft Law, *Civil Code* § 1798.92 et seq.; and (4) the California Rosenthal Fair Debt Collection Practices Act ("Rosenthal"), *Civil Code* § 1788.18.

Plaintiff disputes Defendant's SUF Nos. 2 – 6, 9 – 13 & 15 – 30. (See Genuine Disputes, Part I.) The correct facts, also set forth in Part II of Plaintiff's Genuine Disputes, are as follows.

### TOPIC 1: THE IDENTITY THEFT

1. The identity theft scheme hatched by Rebecca Markham was sophisticated. She created falsified Discover bills so that Fred Peters would not notice discrepancies.  She did transactions and made payments online to avoid Fred Peters' notice.  She created bogus checks, which Fred Peters would sign, only to be replaced

2

1   by checks she signed fraudulently to make payments.  All in all, the scheme was
2   sophisticated and specifically designed to prevent Fred Peters from learning of the
3   identity theft with normal diligence and scrutiny.  Only extraordinary diligence and
4   scrutiny would have discovered it at an earlier date.  (Mary Peters Decl., para.2, 5;
5   Tom Tarter Decl., para. 2.)

6          2. Fred Peters is presently 75 years old and was in his early 70's at the time of
7   the identity theft.  He does not use the internet for any of his financial or credit
8   transactions.  He is generally unfamiliar with how the internet works. (Fred Peters
9   Decl., para. 2.)

10         3. Fred Peters is a truck and heavy equipment repair mechanic.  Other than
11  mechanic's training, he has no education beyond high school and no formal training
12  in running an office or in managing business financial matters.  He has been
13  delegating the administrative portion of his business to others for years. (Mary Peters
14  Decl., para. 11.)

15         4. Being a truck and heavy equipment repair mechanic in Nuevo, Ca.
16  (agricultural area of Riverside County) is a seven-day-a-week job, because farmers
17  and ranchers need to have equipment up and running continuously to care for their
18  farm animals and livestock and to tend to their crops.  Before he discovered the
19  identity theft in November of 2010, Fred Peters had between two and four junior
20  mechanics to help him service his customers.  He had an established book of
21  business including several large farms and ranches in the Nuevo area. (Fred Peters
22  Decl., para. 5; Mary Peters Decl., para. 18.)

23         5. When Fred Peters learned of the identity theft, he simultaneously discovered
24  that he had almost no money in his accounts.  Unable to afford them, he laid off his
25  junior mechanics and began servicing all of his accounts by himself.  At over 70
26  years old, he began working 10- 12-hour days, seven days a week, just to survive.
27  (Fred Peters Decl., para. 5.)

28

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

6. It is unlikely that Fred Peters would have uncovered the identity theft by reviewing the Discover or the Bank of America monthly statements. The Discover monthly statements often were doctored by Rebecca Markham to conceal her identity theft. Fred would cut checks to Discover to pay for his charges, which checks Rebecca Markham would then hide or destroy and then make much larger payments to Discover online, using Fred Peters' Bank of America savings account. All in all, Rebecca Markham would consistently doctor the records which Fred Peters would see, or conceal them, so that he would never see the true statements or account balances. Fred Peters would never see Rebecca Markham's online activity because Fred Peters never went online and did not use the internet. (Fred Peters Decl., para. 7; Mary Peters Decl., para. 5.)

7. Fred Peters had neither the time nor the training to resolve the identity theft situation after it occurred, so his wife, Mary Peters, took over and began trying to straighten out the situation. (Mary Peters Decl., para. 3.)

8. Mary Peters immediately contacted the police, and provided the police with all information she had about the identity theft. She obtained a police report, along with supplements to the original report, and provided them to Discover and to the credit bureaus. (Mary Peters Decl., para. 2.)

9. Because the identity theft scheme was sophisticated, Mary Peters did not uncover the full range of the identity theft for several months. As she uncovered more and more details, she would provide them to the police and with the creditors who were continuing to collect on identity theft charges. As soon as she uncovered any new information, she would provide it to Discover. Ultimately, Mary Peters determined that the identity theft scheme had been going on since 2006. (Mary Peters Decl., para. 2, 3, 8.)

///

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

## TOPIC 2: DISCOVER NEVER RECONCILED THIS ACCOUNT AND NEVER PRESENTED AN ACCURATE BILL TO THE PETERS FOLLOWING THE IDENTITY THEFT

10. Discover has never contested the industry standard that it should re-credit plaintiff for money stolen through the identity theft. This is the standard of the industry. (Thomas Tarter Decl., para.16.)

11. The situation here is an identity theft. Some of the participants have referred to it as an "account takeover," and others have referred to it as "embezzlement," but it has always been an identity theft: Rebecca Markham stole the identity of Fred Peters and used his identity fraudulently and without his permission to engage in financial transactions for her own benefit, using plaintiff's money or credit. (Thomas Tarter Decl., para.17.)

12. In identity theft situations, it is often not possible for the consumer to realize the identity theft within a 60- or 90-day period. Some identity thefts, such as this one, are sophisticated and can go on for years undetected. (Thomas Tarter Decl., para. 19.)

13. Where the identity theft has gone on for years, undetected, and where the consumer is not complicit in the identity theft, it is the industry standard to do two things: first, the bank/creditor works with the consumer to specifically identify all of the fraudulent charges, going back to the beginning of the identity theft. Second, the bank cancels any identity theft charges, and also cancels any interest, penalties or late fees arising from those charges. (Thomas Tarter Decl., para. 21.)

14. Discover does not contend that Fred Peters was in any way complicit in the identity theft. (Thomas Tarter Decl., para. 22.)

15. In this case, Discover Bank *never* specifically identified all of the identity theft charges. Discover's own corporate witness, Maria Micione, testified that Discover could only "ballpark" the amount that it believed Fred Peters still owed on the credit card. In response to the identity theft, DISCOVER did create a new

1    account, the "2476" account, but failed to close out the old "0789" account. Ms.

2    Micione did not know if any of the fraud charges, or interest and penalties on the

3    fraud charges, were transferred from the old "0789" account to the new "2476"

4    account, and admitted that the balance that was transferred between these accounts

5    was not correct. (Micione depo, pp. 12:25-13:15, 48:3-50:1; Mary Peters Decl.,

6    paras. 12 and 13.)

7        16. Discover Bank refused to go back earlier than 2008 to identify identity

8    theft charges, although Mary Peters specifically advised DISCOVER that the

9    identity theft had begun in 2006. (Mary Peters Decl., paras. 3, 11-12; Thomas Tarter

10    Decl., para. 24.)

11       17. Without going back to the inception of the identity theft, it would be

12    impossible for any bank to accurately identify, and cancel, all of the identity theft

13    charges, as well as any interest or penalties deriving from the identity theft charges.

14    (Thomas Tarter Decl., para. 25.)

15       18. It is well-established industry standard that a bank or credit card company

16    does not bill a consumer based on an "ballpark" estimate. The bank or credit card

17    company must exactly add up all legitimate charges, late fees, interest and penalties,

18    and likewise back out any charges, late fees or penalties deriving from identity theft

19    charges. Only when the bank or credit card company has done this can it present a

20    true bill to a consumer. Until the bank or credit card company presents a true bill,

21    the consumer is within his or her rights to challenge the bill. Here, Discover's

22    "ballpark" was based on four months of activity: December 2010 through March of

23    2011, and neglected the preceding four years, going back to when the identity theft

24    started in 2006. (Ex. 4, Micione deposition, 62:14-63:7; Thomas Tarter Decl., para.

25    26.)

26       19. Here, Discover never presented a true bill to Fred Peters following the

27    identity theft. It never performed a full reconciliation back to the beginning of the

28

identity theft to determine what was actually owed, if anything. (Ex. 4, Micione deposition, p. 65:3-13; Mary Peters Decl., para. 7; Thomas Tarter Decl.,27.)

20. At one point, a representative named Mr. R. Jacks from Discover recognized the magnitude of the identity theft, and also recognized that Discover had charged substantial interest, late fees and penalties on identity theft charges. He advised Mary Peters that Discover would zero out the account altogether. However, when Mary Peters called back to Discover to follow up, Mr. R. Jacks no longer worked in that department and she could not get a hold of him. Plaintiff would have been satisfied at that time if the account had just been zeroed out. (Mary Peters Decl., para. 16, Discover account notes, produced in discovery, Ex. 1, DB 000444-5, lines 795-800.)

21. Mary Peters finally performed the account reconciliation that Discover failed or refused to perform. By her calculations, Discover owes Fred Peters conservatively $15,000 to $20,000 in Markham's fraudulent charges, and interest and late fees. (Mary Peters Decl., para. 17.)

**TOPIC 3: DISCOVER ADDED CHARGES WHICH IT KNEW TO BE IDENTITY THEFT CHARGES BACK ONTO PLAINTIFF'S CREDIT CARD, AFTER IT HAD TAKEN THEM OFF, AND THEN CONTINUED TO CHARGE PENALTIES AND INTEREST ON THE IDENTITY THEFT CHARGES.**

22. In response to the identity theft, Discover failed to close out plaintiff's old credit card when it opened a new Discover card for plaintiff. The new Discover card initially opened with a zero balance. The old account number ended in 0789, while the new account ended in 2476. (Mary Peters Decl., para. 13.)

23. After Discover opened up the new card, Discover placed over $5,000 in charges onto the new "2476" card, which Mary Peters did not understand. Discover also continued to place charges onto the old "0789" card. Mary Peters called

7

Discover repeatedly to try to find out the source of these new charges, but Discover never provided her with an answer. (Mary Peters Decl., para. 13.)

     24. It was not until after plaintiff filed this lawsuit that plaintiff finally discovered where these new charges had come from: Discover billed plaintiff for identity theft charges *which it knew to be identity theft charges.* Here is how this happened:

    a. Rebecca Markham would pay the Discover bills, inflated by identity theft charges, out of Fred Peters' Bank of America checking account.

    b. Mary Peters identified for Bank of America the amount of money from the Bank of America account which had been used to pay for fraudulent charges. Bank of America re-credited Fred Peters for that amount.

    c. Bank of America then charged back Discover Bank for this amount, as is not an uncommon practice between banks in an identity theft situation.

    d. Discover Bank paid the Bank of America charge-back.

    e. *However, then Discover Bank put the amount of what it had paid to Bank of America as a new charge onto plaintiff's new Discover credit card!* In other words, Discover Bank charged plaintiff for what it had had to pay Bank of America because of the identity theft against the plaintiff. Discover then continued to charge interest, penalties and late fees on top of these fraudulent charges. (Micione deposition, 73:6-74:4; 99:17-101:10; Mary Peters Decl., para. 15; Thomas Tarter Decl., para. 32.)

     25. It is positively beneath any industry standard for a credit card company to charge back to a consumer what the credit card company has had to pay in charge-backs to a bank because the consumer has been the victim of an identity theft. Banks deal with the risks of identity theft through insurance and through the pricing of their products. Consumers generally do not have these resources. When a bank has to re-credit money to a consumer, or has to cancel credit charges, because of an identity theft against the consumer, the bank is in a far better position to either make an

1  insurance claim or to write it off to profit & loss. The consumer, and particularly

2  Fred Peters, usually faces catastrophic consequences if he is forced to pay the

3  identity theft charges. (Thomas Tarter Decl., para. 33.)

4  **TOPIC 4: DISCOVER CREDIT-REPORTED THE PETERS**

5  **FOR LATE PAYMENTS WHEN DISCOVER TOLD THE PETERS**

6  **NOT TO MAKE PAYMENTS BECAUSE AN IDENTITY THEFT**

7  **INVESTIGATION WAS ONGOING.**

8  26. Mary Peters spoke to the Discover fraud department about the identity theft

9  situation. Representatives from the Discover fraud department advised Ms. Peters

10  not to make payments until after their investigation was completed. (Mary Peters

11  Decl., para. 15.)

12  27. Despite telling plaintiff not to make payments pending the outcome of the

13  investigation, Discover then credit-reported plaintiff for not making payments.

14  Discover never advised Mary Peters that it had completed its investigation and that

15  she should resume payments. (Mary Peters Decl., paras. 13-16.)

16  **TOPIC 5: DISCOVER'S CREDIT REPORTS WERE**

17  **ERRONEOUS ON THEIR FACE**

18  28. Discover Bank continually reported different balances to credit bureau

19  Experian, and the different amounts had no relation to any of Fred Peter's monthly

20  charges or payments. These wildly varying payment amounts alone should have

21  been noticed to Discover that the credit reporting was inaccurate, incomplete and

22  unverifiable. (Plaintiff's Response to Discover Statement of Facts, Fact No. 35;

23  Thomas Tarter Decl., para. 36.)

24  **TOPIC 6: DISCOVER'S REINVESTIGATION WAS SERIOUSLY FLAWED,**

25  **AND ITS HANDLING OF THIS ACCOUNT IN GENERAL WAS WELL**

26  **BENEATH THE INDUSTRY STANDARD.**

27  29. The standard in the industry for credit reporting, which is also the legal

28  standard, is that a furnisher of credit information (here, Discover) cannot credit-report

1  information which it learns on reinvestigation to be inaccurate, incomplete or
2  unverifiable. (Thomas Tarter Decl., para. 37, 15 U.S.C. Section 1681s-2 (b)).

3       30. Here, Discover's reinvestigation suffered from a fatal flaw at the outset:
4  Discover had never undertaken the account reconciliation required to determine the
5  accurate amount which Fred Peters owed on his Discover account, if he owed any
6  amount.  In this case, the first step of any reasonable reinvestigation would have been
7  a thorough account reconciliation, dating back to the beginning of the identity theft in
8  2006. (Thomas Tarter Decl., para. 38.)

9       31. Continuing to credit-report plaintiff when Discover had either failed or
10 refused to perform a full account reconciliation constitutes a *willful and reckless*
11 violation of the applicable credit reporting laws. (Thomas Tarter Decl., para. 39.)

12      32. Discover also claims that its only obligation on reinvestigation is to
13 myopically look at the abbreviated statement on the Automated Consumer Dispute
14 Verification form ("ACDV") issued by the credit bureaus, in this case, Experian and
15 Equifax.  However, Discover had a *wealth* of information available from Mary Peters
16 and available from the law enforcement agencies investigating the identity theft.
17 Mary Peters in fact provided Discover with extensive documentation and her own
18 accounting showing the fraudulent charges.  For Discover to ignore this information,
19 which it had in its possession or which was readily available to it, in the course of its
20 reinvestigation, was positively *unreasonable.*  (Thomas Tarter Decl., para. 40-42.)

21      33. It was also *unreasonable* for Discover to add the charged-back fraud
22 charges back onto the new credit card, and then fail or refuse to inform the Peters that
23 this explained the account balance which appeared on the new card.  If its
24 reinvestigation failed to uncover, and then subtract, these added-back fraud charges,
25 then the investigation was *unreasonable.* (Thomas Tarter Decl., 43.)

26      34. As stated above (Fact No. 28), Discover continually credit-reported varying
27 amounts to credit bureau Experian.  This alone was sufficient notice to Discover of
28 the inaccurate, incomplete and unverifiable credit reporting, and failing to rectify this

10

1    erratic and unverified pattern of credit reporting itself is *unreasonable.* (Plaintiff's

2    Response to Discover Statement of Facts, Fact No. 35; Thomas Tarter Decl., para.

3    44.)

4          35. Credit-reporting plaintiff for payments not made when Discover's own

5    fraud department instructed Mary Peters to cease making payments pending the

6    outcome of the fraud investigation is both *unreasonable* and *reckless and willful.*

7    (See Fact Nos. 26 and 27, above)

8          36. Conducting a so-called "reinvestigation" while *repeatedly ignoring* the

9    abundant information it had immediately at its disposal constitutes a *willful and*

10   *reckless* violation.  The Peters did far, far more than should be expected of any

11   identity theft victim.  Discover's utter refusal to put a responsible person, or a

12   responsible team, in charge of reconciling the account and rectifying the identity theft

13   situation, when Discover had at its fingertips abundant information and a very willing

14   victim's wife to participate in the reinvestigation, is sheer recklessness and is

15   inexcusable. (Thomas Tarter Decl., para. 46.)

16         37. The ACDV forms which Discover received from the credit bureaus alerted

17   Discover to the identity theft and to the existence of fraudulent charges.  The Equifax

18   ACDV referred to "identity fraud" and indicated that "Consumer sent police report

19   from Riverside County," and went on to give the date of the report and the reporting

20   officer.  The police report included a long list of many of the fraudulent charges.  A

21   reasonable reinvestigation at this point would have been to obtain a copy of the police

22   report and not just to confirm the identity of the person who opened the account,

23   which is all that Discover bothered to do. (Discover Fact Nos. 29 and 30; Thomas

24   Tarter Decl., para. 47.)

25         38. The EXPERIAN ACDV was even more specific: "Claims account

26   takeover, *fraudulent charges made on account...Former secretary embezzled*

27   *money and committed ID theft.  She used the card and made fraudulent charges*

28   *without permission."*  Here, there is positively no disputing that Experian put

Discover on notice of the fraudulent charges made on the account.  However, per Discover's own statement of facts, all it did was verify the identity of Fred Peters. **DISCOVER did nothing in response to this ACDV to identify or otherwise rectify the fraudulent charges.**  This renders its reinvestigation *unreasonable*. (Discover Fact Nos. 32, 33 and 34; Thomas Tarter Decl., para. 48.)

39. Discover did not provide in discovery, nor in its summary judgment motion, any witness who actually participated in the reinvestigation.  Discover produced for deposition a corporate witness, Maria Micione, who *had no personal knowledge whatsoever* of the so-called reinvestigation. (Brennan declaration)

40. There is *no evidence whatsoever* that Discover considered at all the abundant information that Mrs. Peters had provided to it about the identity theft and the identity theft charges.  Failing or refusing to consider evidence which is readily available during a reinvestigation under FCRA is *unreasonable*. (Thomas Tarter Decl., para. 49.)

41. A reinvestigation is not necessarily bounded by the short coded synopsis of the dispute as contained in the ACDV form from the credit bureaus.  All major banks and creditors know that the ACDV forms are very, very abbreviated, and it is often necessary to go outside of the ACDV abbreviated statement to conduct a reasonable reinvestigation.  What is a reasonable reinvestigation is defined by the circumstances, and, under banking industry standards, it is widely recognized that a reasonable reinvestigation often has to look beyond the short, abbreviated version of the dispute as given in the ACDV forms. (Thomas Tarter Decl., para. 50.)

42. Evidence of the circus atmosphere at Discover is the fact that Mary Peters called Discover over 80 times about her dispute *and had to deal with 80 or more customer service representatives!*  She had to explain her dispute anew each and every time, which led to untold frustration.  Each customer service representative would tell her something different and would do something different.  Some representatives reversed charges; some added charges back; some took charges off;

12

some added back charges which had previously been taken off, with no explanation. *There is no evidence in this case of a consistent, methodical handling of the plaintiff's identity theft situation, overseen by a single or small number of responsible and competent individuals, which is what a reasonable reinvestigation would have required in this case.* Instead, Mary Peters is treated to a "boiler room" call center where each new representative has little or no information about what the past representatives have done, and each one tries to "pass the buck" down the line because each one lacks either the ability or the discretion, or both, to resolve the issue. (Mary Peters Decl., paras. 3, 12; Thomas Tarter Decl., para. 51; Ex. 4, Micione deposition, p. 53: 16-22.)

43. Discover was still reporting Fred Peters as late on his bill to DISCOVER as recently as August 26, 2013. (Plaintiff's Response to Discover's Statement of Facts, No. 35.)

**TOPIC 7: PLAINTIFF DOES NOT OWE DISCOVER FOR ANY OF THE LEGITIMATE CHARGES HE MADE ON THE CARD; IF ANYTHING, DISCOVER OWES PLAINTIFF BECAUSE DISCOVER HAS FAILED TO SUBTRACT OUT ALL OF THE IDENTITY THEFT CHARGES AND THE INTEREST, PENALTIES AND LATE CHARGES WHICH ACCRUED ON THE IDENTITY THEFT CHARGES.**

44. Mary Peters performed an account reconciliation on her own, after Discover failed to perform one. She arrived at the conclusion that Discover owes Fred Peters conservatively $15,000 to $20,000 for unforgiven identity theft charges, along with interest, penalties and fees on those charges of which Discover credited Plaintiff for less than $2,000. Bear in mind, Rebecca Markham used Fred Peters' money to pay for her identity theft charges, and Discover has never fully re-credited these sums back to Fred Peters. (Mary Peters Decl., paras. 7-12 and 17.)

45. While Fred Peters admits that he made some legitimate charges on the Discover card after he reported the identity theft, these were relatively small, and he

1 │ only stopped making payments after Discover advised Mary Peters to stop making
2 │ payments pending the identity theft investigation.  Even subtracting out the legitimate
3 │ charges which Fred Peters made, Discover still owes Fred Peters conservatively
4 │ $15,000 to $20,000 in Markham fraudulent charges, and the interest and late fees.
5 │ (Mary Peters Decl., paras. 11, 17.)

**TOPIC 8: FRED PETERS SUFFERED BOTH ECONOMIC
AND NON-ECONOMIC DAMAGES AS A CONSEQUENCE OF
DISCOVER'S UTTER MISHANDLING OF HIS ACCOUNT
AND THE CREDIT-REPORTING OF HIS ACCOUNT.**

46. Discover still owes plaintiff conservatively $15,000 to $20,000 in identity theft charges for which he paid, plus interest, penalties and late fees on those charges. (Mary Peters Decl., para. 17.)

47. Fred Peters' business suffered.  Fred Peters is a sole proprietor and relies upon his available credit to buy parts to service his accounts, and also to pay his assistant mechanics when collections are slow.  As a result of the continuous negative credit reporting and account mismanagement by Discover, Fred Peters' available credit dried up.  He was denied a credit card from US Bank because of his credit report.  He was unable to hire on additional workers to service his accounts.  He became unable to buy replacement parts and tools on credit, which he had always done before Discover began the negative credit reporting.  At 75 years old, he has to now service all of his clients' needs by himself, forcing him to work 7 days a week, 12 hours a day. (Mary Peters Decl., paras. 18, 19, 21.)

48. Fred Peters detailed over $200,000 in economic losses, caused in whole or in substantial part by Discover's actions, in a series of interrogatory responses. (Fred Peters responses to Supplemental Interrogatories, Ex. 19.)

49. Tom Tarter also calculated that Mr. Peters' inability to hire on mechanics to help him service accounts has cost him business and profits in the approximate sum of $216,720.00. (Thomas Tarter Decl., para. 54.)

14

50. In addition, Fred Peters is now a broken man as a consequence of his inability to extricate himself from this identity theft.  It has now been going on for three years, and Discover has relentlessly continued to bollix up the account and issue false negative credit information about him.  He has had severe bouts of sleeplessness.  He is often depressed.  He is now confused more easily, and much more forgetful.  He now suffers from high blood pressure, whereas he did not before the identity theft.  He is frequently tired and lethargic.  His inability to put this identity theft in the past, because of Discover's mishandling of his account and the credit-reporting, has left him a spiritually broken man. (Mary Peters Decl., para. 21.)

## III. ARGUMENT

### A. STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is only appropriate if the record, read in the light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Rule 56 should be cautiously invoked to the end that parties may always be afforded trial where there is bona fide dispute of facts between them. *Associated Press v. United States*, 326 U.S. 1, 6, 89 L.Ed. 2013, 65 S.Ct. 1416 (1945).

### B. QUESTIONS OF FACT PRECLUDE SUMMARY ADJUDICATION OF PLAINTIFF'S FIRST CAUSE OF ACTION FOR VIOLATION OF THE FCRA.

Discover asserts that Plaintiff cannot establish any of his causes of action because he cannot prove that Discover knowingly reported or attempted to collect on charges designated by Plaintiff as unauthorized or that were inaccurate. (Def. P&As, p. 9, line 27 – p. 10, line 1.) The facts indicate otherwise. (See Plf. Facts Nos. 1 – 28.)

1   Discover relies upon *Minskoff v. American Express Travel Related Servs. Co.*,
2   98 F.3d 703, 709-10 (2d Cir. N.Y. 1996) regarding the creation of apparent authority
3   for unauthorized charges. (Def. P&As, p. 10, lines 9 – 13.) *Minskoff*, however, was
4   not decided under the statutes in issue here. The case was decided under the Truth in
5   Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., and is distinguishable on its facts.
6   The plaintiff in that action was a sophisticated president and CEO of a real estate
7   holding and management firm. He and the firm failed to detect an employee's
8   unauthorized charges of approximately $300,000 on a corporate American Express
9   card. Identity theft was not in issue. The court noted that "[t]he existence of apparent
10  authority is normally a question of fact, and therefore inappropriate for resolution on a
11  motion for summary judgment." *Minskoff*, *supra*, 98 F.3d at 708. The facts here differ
12  from *Minskoff* in that identity theft is the issue and there is a clear question of fact as
13  to whether Mr. Peters should have detected Ms. Markham's fraud. (See Plf. Facts
14  Nos. 1 – 21.)

15  Discover further argues that Plaintiff cannot point to any evidence that Discover
16  reported Plaintiff as delinquent in an amount greater than what he actually owed,
17  which Discover claims is over $1,600. (Def. P&As, p. 10, lines 14 – 16.) Again,
18  Discover's assertion is clearly false. (See Plf. Facts Nos. 10 – 25 & 28 – 45.)
19  Conservatively, Mr. Peters is owed $15,000 to $20,000 by Discover. (Plf. Fact No.
20  45.) Defendant also states that Plaintiff cannot "point to a single alleged unauthorized
21  charge that Discover is reporting as delinquent." (Def. P&As, p. 10, lines 16 – 17,
22  citing SUF 20 – 27.) Plaintiff disputes each of the facts offered by Defendant. (See
23  Plaintiff's Genuine Disputes, responses to SUF 20 – 27, and Plf. Facts Nos. 15 – 25 &
24  30 – 45.)

25  Defendant ignores the evidence in arguing that Plaintiff cannot prove that
26  Discover ever attempted to collect amounts higher than those he admits he
27  legitimately owed. (Def. P&As, p. 10, lines 17 – 19, citing SUF 35.) (See Genuine
28  Disputes, response to SUF 35, and Plf. Facts Nos. 10 – 45.)

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**1. Discover Failed to Conduct a Reasonable Investigation as Required by the FCRA.**

Discover argues that Plaintiff cannot show that it failed to conduct a reasonable investigation. (Def. P&As, p. 11, line 24 – p. 14, line 7.) The facts, supported by the declaration of Plaintiff's expert, Thomas Tarter, establish otherwise. (See Plf. Facts Nos. 29 – 43.) Discover never undertook an account reconciliation (Plf. Fact No. 30), ignored the wealth of information made available by Mary Peters (Plf. Fact No. 32), did nothing in response to the ACDV which specifically identified the fraud (Plf. Fact No. 38), forced Mary Peters to deal with over 80 customer service representatives who each provided inconsistent handling and merely "passed the buck." (Plf. Fact No. 42.) Plaintiff's expert, Thomas Tarter, discusses the investigation, calling it unreasonable, reckless and willful. (Plf. Facts Nos. 31 – 42.)

Discover's rendition of the law applicable to the "reasonableness" of the investigation is inaccurate because it is incomplete. (Def. P&As, p. 11, line 24 – p. 12, line 27.) The court in *Johnson v. MBNA America Bank, N.A.*, 357 F.3d 426, 430-31 (4th Cir. Va. 2004) noted that an investigation is "a **detailed inquiry** or **systematic examination**," and for purposes of the FCRA, "requires some degree of **careful inquiry**," not a "superficial" one. (Bold added.) A section 1681s-2(b) investigation "requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155 (9th Cir. Cal. 2009).

When the nature of the dispute concerns **fraud or identity theft**, "a more thorough investigation" is warranted. *King v. Asset Acceptance, LLC*, 452 F.Supp. 2d 1272, 1279 (N.D. Ga. 2006), citing *Westra, supra*, 409 F.3d at 827.

Defendant relies upon *Chiang v. Verizon New England, Inc.*, 595 F.3d 26 (1st Cir. Mass. 2010) and *Stroud v. Bank of America*, 886 F. Supp. 2d 1308 (S.D. Fla. 2012) as examples of FCRA claims where the plaintiffs could not show the investigations were unreasonable. (Def. P&As, p. 12, line 12 – p. 13, line 13.) In these

1   two cases, the plaintiffs did not provide any factual evidence relating to the

2   unreasonableness of the reinvestigations, but relied upon their own hunches. *Chiang*,

3   *supra*, at 38; *Stroud, supra*, at 1314. There is no indication in either case that those

4   plaintiffs provided the court with an expert's report, as is the case here. (Plf. Facts

5   Nos. 10 – 45.) Here, unlike *Chiang* and *Stroud*, there is ample evidence that Discover

6   failed to conduct a reasonable investigation, including an expert's declaration. (Plf.

7   Facts Nos. 29 – 43.)

8         In addition to *Chiang, supra,* Discover cites Discover relies upon *Collins v.*

9   *BAC Home Loans Servicing LP*, 912 F.Supp.2d 997, 1011-12 (D. Colo. 2012) .

10   *Chiang* and *Collins* do not involve identity theft situations.  For an identity theft

11   situation, a more thorough investigation is needed. *King, supra.*

12         Discover relies only on its facts SUF 29 – 34, but Plaintiff disputes these facts.

13   (Def. P&As, p. 13, lines 18 – 21; see Genuine Disputes, responses to SUF 29 – 34;

14   Plf. Facts Nos. 10 – 43.)

15         **2. Discover Reported Inaccurate Information.**

16         Discover argues that it did not improperly report inaccurate information. (Def.

17   P&As, p. 14, line 8 – p. 15, line 16.) Defendant relies upon its facts, SUF 20 – 23, 25,

18   31 & 34 for its argument. Each of these facts are disputed. (See Plf. Genuine Disputes,

19   response to SUF 20 – 23, 25, 31 & 34; Plf. Facts Nos. 10 - 28.)

20

21         **C. <u>QUESTIONS OF FACT PRECLUDE SUMMARY ADJUDICATION</u>**

22   **<u>OF PLAINTIFF'S FOURTH CAUSE OF ACTION FOR VIOLATION OF THE</u>**

23   **<u>CCRAA.</u>**

24         Defendant argues that the standard under the FCRA, 15 U.S.C. § 1681s-

25   2(a)(1)(D), should be applied to the CCRAA. (Def. P&As, p. 16, lines 7 – 20.) The

26   standard under the CCRAA is: "A person shall not furnish information on a specific

27   transaction or experience to any consumer credit reporting agency if the person **knows**

28

1  **or should know** the information is incomplete or inaccurate." *Civil Code* §
2  1785.25(a) (bold added).

3       Defendant ignores the CCRAA standard and focuses on only one of several
4  aspects of the FCRA in section 1681s-2(a). Defendant refers to the term "reasonable
5  cause to believe that the information is inaccurate," which is defined in the FCRA to
6  means "having specific knowledge, other than solely allegations by the consumer, that
7  would cause a reasonable person to have substantial doubts about the accuracy of the
8  information." 15 U.S.C. § 1681s-2(a)(1)(D). While the facts here show that standard
9  as met (see Plf. Fact Nos. 10 – 45), the FCRA also has the standard from section
10 1681s-2(a)(1)(B), which prohibits reporting after notification of an inaccuracy, if the
11 information is inaccurate.

12      Although the CCRAA standard "knows or should know" is applicable here, the
13 information reported was inaccurate under any of the standards suggested. Defendant
14 supports its argument with its facts SUF 17 – 19 only. (Def. P&As, p. 16, lines 17 –
15 20.) These facts are disputed. (See Genuine Disputes, responses to SUF 17 – 19.)
16 There is ample evidence that Discover knew or should have known the information
17 being reported was inaccurate. (See Plf. Facts Nos. 10 – 45.)

18
19     **D. QUESTIONS OF FACT PRECLUDE SUMMARY ADJUDICATION**
20 **OF PLAINTIFF'S SECOND AND THIRD CAUSES OF ACTION FOR**
21 **VIOLATION OF THE IDENTITY THEFT LAW AND ROSENTHAL. THE**
22 **APPLICABLE PROVISIONS OF THESE STATUTES ARE NOT**
23 **PREEMPTED BY THE FCRA.**

24      Defendant argues that Plaintiff's Rosenthal and Identity Theft Law causes of
25 action are preempted by the FCRA. (Def. P&As, p. 17, line 1 – p. 18, line 5.)
26 Plaintiff's Rosenthal claim is brought under the identity theft provision of that Act,
27 *Civil Code* § 1788.18, which requires that a debt collector cease collection activities
28 upon being properly notified that the debt arises from identity theft. Plaintiff's Identity

1  Theft Law claim is brought under *Civil Code* § 1798.93, which provides remedies

2  against a claimant which failed to diligently investigate an identity theft victim's

3  claim. These provisions are not preempted.

4      The FCRA provides that it "does not annul, alter, affect, or exempt any person

5  subject to the provisions of this subchapter from complying with the laws of any

6  State . . . except to the extent that those laws are inconsistent with any provision of

7  this subchapter, and then **only to the extent of the inconsistency**." 15 U.S.C. §

8  1681t(a) (bold added). Sections 1788.18 and 1798.93 are not inconsistent with the

9  FCRA.

10      "Preemption analysis . . . generally begins with a presumption against

11  preemption, that is, 'with the assumption that the historic police powers of the States

12  were not to be superseded by the Federal Act unless that was the clear and manifest

13  purpose of Congress.'" *Sanai v. Saltz*, 170 Cal.App.4th 746, 772 (2nd Dist. 2009),

14  quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed.

15  1447 (1947).

16      Any provisions of Rosenthal would only be preempted to the extent that

17  compliance with them would result in *violation* of the FCRA. *Cisneros v. U.D.*

18  *Registry, Inc.*, 39 Cal.App.4th 548, 578 (2nd Dist. 1995). Although the court in

19  *Cisneros* was analyzing preemption of the CCRAA by the FCRA, the court's broad

20  language applies equally to Rosenthal:

21      "In enacting FCRA, Congress did not attempt to reserve to itself all
22      efforts to regulate the consumer reporting business. (See 15 U.S.C. §
23      1681t ['This subchapter does not annul, alter, affect, or exempt any
        person subject to the provisions of this subchapter from complying with
24      the laws of any State with respect to the collection, distribution, or use of
        any information on consumers, except to the extent that those laws are
25      inconsistent with any provision of this subchapter, and then **only to the**
26      **extent of the inconsistency**.']; *Credit Data of Arizona, Inc. v. State of*
        *Ariz.* (9th Cir.1979) 602 F.2d 195, 197.) **California is not foreclosed**
27      **from enacting greater protections for consumers** injured by the
28      activities of reporting agencies. . . . Under the Supremacy Clause, state
        law is preempted only if it 'is in direct conflict with federal law **such**

20

1
2
3
4
5

**that compliance with both is impossible,** or the state law is an obstacle to the accomplishment of the full purposes and objectives of Congress....' (*Gomon v. TRW, Inc.* (1994) 28 Cal.App.4th 1161, 1173, 34 Cal.Rptr.2d 256; accord *Doyle v. Board of Supervisors* (1988) 197 Cal.App.3d 1358, 1363, 243 Cal.Rptr. 572.) The remedies afforded to injured consumers by CCRAA are not inconsistent with, but are in addition to, remedies provided by FCRA."

6

*Cisneros, supra*, 39 Cal.App.4th at 577 (bold added).

7

The court in *Cisneros* went on to state:

8
9
10
11
12
13

"According to the FTC, '**State law is pre-empted by the FCRA only when compliance with inconsistent State law would result in *violation of the FCRA.***' (16 C.F.R., pt. 600, app., § 622, ¶ 1 (1995), emphasis added). This interpretation 'is based on an unequivocal statement in the principal report in the FCRA's legislative history by the Senate Committee on Banking and Currency that, under the pre-emption provision, '**no State law would be preempted unless compliance would involve a violation of Federal law.**' S.Rep., 91-517, 91st Cong., 1st Sess. 8 (November 5, 1969)."

14

*Cisneros, supra*, 39 Cal.App.4th at 578 (bold added).

15
16

Other decisions are in accord with *Cisneros*. For example, in *Gomon v. TRW, Inc.*, 28 Cal.App.4th 1161 (4th Dist. 1994), the court stated:

17
18
19
20
21
22
23

"Under the Supremacy Clause of the United States Constitution, if state law is in direct conflict with federal law **such that compliance with both is impossible or the state law is an obstacle to the accomplishment of the full purposes and objectives of Congress,** the state law is preempted. (*Silkwood v. Kerr-McGee Corp.* (1984) 464 U.S. 238, 257, 104 S.Ct. 615, 621, 78 L.Ed.2d 443, 458; 7 Witkin (9th ed. 1988) Summary of Constitutional Law, § 7, p. 49.) However, the CCRAA does not conflict with the FCRA, nor is it an obstacle to its purposes and objectives."

24

*Gomon, supra*, 28 Cal.App.4th at 1173-74 (bold added).

25
26
27
28

In the present case, there is no preemption because the allegations arise out of Discover's role as a debt collector, rather than as a furnisher of credit information. Under Rosenthal, the definition of "debt collector" includes not only third-party debt collectors, but any person who collects "on behalf of himself or herself." *Civil Code*

1 │ § 1788.2(c).

2

3 │ **E. DEFENDANT'S ESTOPPEL ARGUMENT FAILS.**

4 │     Defendant argues that if its summary judgment motion fails, that Plaintiff

5 │ should be estopped from recovering as a matter of law. (Def. P&As, p. 19, line 17 – p.

6 │ 22, line 19.) It is unclear how estoppel as a matter of law differs from partial summary

7 │ judgment as a matter of law. Nevertheless, Defendant's argument is erroneous.

8 │     Defendant's estoppel argument is based on a provision of the Fair Credit Billing

9 │ Act ("FCBA"), 15 U.S.C. § 1666(a), providing a debtor 60 days from the receipt of a

10 │ credit billing to report errors. Defendant overlooks that the FCBA addresses "billing

11 │ errors" as defined in section 1666(b). That definition does not include fraudulent

12 │ charges based on identity theft. The FCBA addresses matters related to "credit

13 │ billing," not "credit reporting," as is in issue here. See 15 U.S.C. § 1666 et seq.

14 │ Moreover, the FCBA does not override state law. 15 U.S.C. § 1666j(a).

15 │     If Defendant's argument is accepted, there would be no need for a statute of

16 │ limitations under the statutes in issue here – the FCRA, CCRAA, Identity Theft Law,

17 │ and Rosenthal. Since Defendant cannot make a statute of limitations argument, its

18 │ estoppel argument must fail.

19 │     Defendant relies on its facts SUF 7 – 12, but Plaintiff disputes these facts. (Def.

20 │ P&As, p. 20, lines 14 – 28 & p. 21, line 25 – p. 22, line 8; see Genuine Disputes, Part

21 │ I, responses to SUF 7, 8 & 10 – 12; and Plf. Facts Nos. 1 – 45.)

22 │     Defendant relies upon four cases for its estoppel argument: *Minskoff v.*

23 │ *American Express Travel Related Servs. Co.*, *supra*; *Asher v. Chase Bank United*

24 │ *States, N.A.*, 310 Fed. Appx. 912, 2009 WL 465083 (7th Cir. Ill. 2009); *Mathy v.*

25 │ *Chase Manhattan Bank, USA*, 2009 U.S. Dist. LEXIS 100373, 2009 WL 3489398

26 │ (C.D. Cal. Oct. 26, 2009); and *DBI Architects, P.C. v. American Express Travel-*

27 │ *Related Services Co.*, 388 F.3d 886 (D.C. Cir. 2004). (Def. P&As, p. 21, lines 3 – 24.)

28

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1      As discussed above, *Minskoff*, was decided under the Truth in Lending Act

2 (TILA), not the statutes in issue here, and the case is distinguishable on its facts.

3 Similarly, *Asher* and *DBI Architects* were decided under TILA, not the statutes here.

4 The *Mathy* case only decided the defendant Chase Bank's counterclaims for breach of

5 written contract and common count – money had and received. There is no discussion

6 creating an estoppel argument related to the claims under consideration here, and

7 Discover has no similar counterclaim against Mr. Peters.

8      Discover relies upon its fact SUF 16 in arguing that the amount it is obligated to

9 credit Plaintiff for "billing errors" under the FCBA. (Def. P&As, p. 22, lines 9 – 19.)

10 As noted above, billing errors under the FCBA do not include charges arising out of

11 identity theft (15 U.S.C. § 1666(b)), and Plaintiff disputes SUF 16. (Genuine

12 Disputes, response to SUF 16; Plf. Facts Nos. 1- 45.) Accordingly, Defendant's

13 estoppel argument fails.

14

15     **F. PLAINTIFF HAS RECOVERABLE DAMAGES.**

16      Discover argues that the Court should limit the amount Plaintiff can recover in

17 damages, relying on its facts SUF 35, 37 – 42 & 44 – 49. (Def. P&As, p. 22, line 20 –

18 p. 25, line 19.) Plaintiff disputes these facts. (Genuine Disputes, response to SUF 35,

19 37 – 42  & 44 – 49; see also, Plf. Facts Nos. 44 – 50.)

20      Discover relies upon *Nelson v. Equifax Information Services, LLC*, 522 F. Supp.

21 2d 1222, 1230 (C.D. Cal. 2007) regarding a duty to investigate not being triggered

22 until notice of a customer dispute is sent by the CRA to the furnisher. (Def. P&As, p.

23 23, lines 1 – 19.) *Nelson* says nothing, however, about damages being limited based

24 on when the duty to investigate is triggered. *Aklagi v. Nationscredit Financial*

25 *Services Corp.*, 196 F.Supp.2d 1186, 1192-93 (D. Kan. 2002) is cited by Discover for

26 the same proposition, but that case also makes no mention of any limitation on

27 damages as Discover implies. (Def. P&As, p. 23, lines 9 – 11.)

28

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1       Moreover, Defendant's argument only applies to the FCRA. There is no

2  "filtering" argument (consumers must first "filter" their disputes through the credit

3  bureaus) for the CCRAA or the Identity Theft Law.

4       Defendant relies on its facts SUF 39 and 40 in arguing that Plaintiff's credit

5  score remains high at 780 and that he was not formally denied credit. (Def. P&As, p.

6  24, lines 5 – 19.) Plaintiff disputes these facts. Plaintiff was not turned down, for

7  example, by U.S. Bank because of his credit score; he was turned down because of

8  the negative credit reporting by Discover. He was told by U.S. Bank that he would

9  have to handle the negative reporting of Discover before he would be eligible for

10  credit from them. (Genuine Disputes, response to SUF 39 & 40.)

11       Contrary to Discover's argument, Plaintiff has incurred damages personally.

12  (Plf. Facts Nos. 44 – 50.) Discover relies on its facts SUF 41, 42 & 48 as support for

13  the assertion that Plaintiff's inability to obtain credit did not have any negative impact

14  on his business. (Def. P&As, p. 24, line 25 – p. 25, line 8.) Discover's facts are

15  disputed. (Genuine Disputes, responses to SUF 41, 42 & 48; Plf. Facts Nos. 44 – 50.)

16       Contrary to Discover's argument, the facts do support Plaintiff's claim for

17  economic damages based on an inability to hire additional employees. (Def. P&As, p.

18  25, line 9 – 19.) Plaintiff disputes facts SUF 44 – 47 upon which Discover relies.

19  (Genuine Disputes, responses to SUF 41, 42 & 48; Plf. Facts Nos. 5 & 46 – 49.) Mr.

20  Peters details over $200,000 in economic losses caused by Discover's action, and Tom

21  Tarter calculates the sum at $216,720. (Plf. Facts Nos. 48 & 49.)

22  ////

23  ////

24  ////

25

26

27

28

1

2 **IV. CONCLUSION**

3   For the above-stated reasons, Defendant's motion for summary judgment, or

4 alternatively, partial summary judgment, should be denied in its entirety.

5         Respectfully submitted,

6 Dated:  Nov. 4, 2013    **LAW OFFICES OF ROBERT F. BRENNAN, A P.C.**

7

8        By:_____

9          Robert F. Brennan

         Attorney for Plaintiff

10          FRED J. PETERS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28