Discover's facts are disputed. (Genuine Disputes, responses to SUF 41, 42 & 48; Plf. Facts Nos. 44 – 50.)

Contrary to Discover's argument, the facts do support Plaintiff's claim for economic damages based on an inability to hire additional employees. (Def. P&As, p. 25, line 9 – 19.) Plaintiff disputes facts SUF 44 – 47 upon which Discover relies. (Genuine Disputes, responses to SUF 41, 42 & 48; Plf. Facts Nos. 5 & 46 – 49.) Mr. Peters details over $200,000 in economic losses caused by Discover's action, and Tom Tarter calculates the sum at $216,720. (Plf. Facts Nos. 48 & 49.)

Respectfully submitted,

Dated:  Nov. 15, 2013        **LAW OFFICES OF ROBERT F. BRENNAN, A P.C.**

By:_____
        Robert F. Brennan
        Attorney for Plaintiff
        FRED J. PETERS

PLAINTIFF'S MEMO OF CONTENTIONS OF FACT AND LAW

1    Discover argues that the Court should limit the amount Plaintiff can recover in

2    damages, relying on its facts. (Def. Summary Judgment P&As, p. 22, line 20 – p. 25,

3    line 19.) Plaintiff disputes these facts. (Summary Judgment, Statement of Genuine

4    Disputes, response to DISCOVER SUF 35, 37 – 42  &  44 – 49; see also, Plf. Facts

5    Nos. 44 – 50.)

6    Discover relies upon *Nelson v. Equifax Information Services, LLC*, 522 F. Supp.

7    2d 1222, 1230 (C.D. Cal. 2007) regarding a duty to investigate not being triggered

8    until notice of a customer dispute is sent by the CRA to the furnisher. (Def. P&As, p.

9    23, lines 1 – 19.) *Nelson* says nothing, however, about damages being limited based

10   on when the duty to investigate is triggered. *Aklagi v. Nationscredit Financial*

11   *Services Corp.*, 196 F.Supp.2d 1186, 1192-93 (D. Kan. 2002) is cited by Discover for

12   the same proposition, but that case also makes no mention of any limitation on

13   damages as Discover implies. (Def. Summary Judgment P&As, p. 23, lines 9 – 11.)

14   Moreover, Defendant's argument only applies to the FCRA. There is no

15   "filtering" argument (consumers must first "filter" their disputes through the credit

16   bureaus) for the CCRAA or the Identity Theft Law.

17   Defendant relies on its facts SUF 39 and 40 in arguing that Plaintiff's credit

18   score remains high at 780 and that he was not formally denied credit. (Def. P&As, p.

19   24, lines 5 – 19.) Plaintiff disputes these facts. Plaintiff was not turned down, for

20   example, by U.S. Bank because of his credit score; he was turned down because of

21   the negative credit reporting by Discover. He was told by U.S. Bank that he would

22   have to handle the negative reporting of Discover before he would be eligible for

23   credit from them.

24   Contrary to Discover's argument, Plaintiff has incurred damages personally.

25   (Plf. Facts Nos. 44 – 50.) Discover relies on its facts SUF 41, 42 & 48 as support for

26   the assertion that Plaintiff's inability to obtain credit did not have any negative impact

27   on his business. (Def. Summary Judgment P&As, p. 24, line 25 – p. 25, line 8.)

28

PLAINTIFF'S MEMO OF CONTENTIONS OF FACT AND LAW

1       In its summary judgment papers, DISCOVER raised an estoppel argument

2  based on a provision of the Fair Credit Billing Act ("FCBA"), 15 U.S.C. § 1666(a),

3  providing a debtor 60 days from the receipt of a credit billing to report errors.

4  Defendant overlooks that the FCBA addresses "billing errors" as defined in section

5  1666(b). That definition does not include fraudulent charges based on identity theft.

6  The FCBA addresses matters related to "credit billing," not "credit reporting," as is in

7  issue here. See 15 U.S.C. § 1666 et seq. Moreover, the FCBA does not override state

8  law. 15 U.S.C. § 1666j(a).

9       If Defendant's argument is accepted, there would be no need for a statute of

10  limitations under the statutes in issue here – the FCRA, CCRAA, Identity Theft Law,

11  and Rosenthal. Since Defendant cannot make a statute of limitations argument, its

12  estoppel argument must fail.

13       Defendant relies upon four cases for its estoppel argument: *Minskoff v.*

14  *American Express Travel Related Servs. Co., supra*; *Asher v. Chase Bank United*

15  *States, N.A.*, 310 Fed. Appx. 912, 2009 WL 465083 (7th Cir. Ill. 2009); *Mathy v.*

16  *Chase Manhattan Bank, USA*, 2009 U.S. Dist. LEXIS 100373, 2009 WL 3489398

17  (C.D. Cal. Oct. 26, 2009); and *DBI Architects, P.C. v. American Express Travel-*

18  *Related Services Co.*, 388 F.3d 886 (D.C. Cir. 2004). (Def. P&As, p. 21, lines 3 – 24.)

19       As discussed above, *Minskoff*, was decided under the Truth in Lending Act

20  (TILA), not the statutes in issue here, and the case is distinguishable on its facts.

21  Similarly, *Asher* and *DBI Architects* were decided under TILA, not the statutes here.

22  The *Mathy* case only decided the defendant Chase Bank's counterclaims for breach of

23  written contract and common count – money had and received. There is no discussion

24  creating an estoppel argument related to the claims under consideration here, and

25  Discover has no similar counterclaim against Mr. Peters.

26

27  **F. PLAINTIFF HAS RECOVERABLE DAMAGES.**

28

*Cisneros, supra,* 39 Cal.App.4th at 577 (bold added).

The court in *Cisneros* went on to state:

> "According to the FTC, **'State law is pre-empted by the FCRA only when compliance with inconsistent State law would result in *violation of the FCRA.***' (16 C.F.R., pt. 600, app., § 622, ¶ 1 (1995), emphasis added). This interpretation 'is based on an unequivocal statement in the principal report in the FCRA's legislative history by the Senate Committee on Banking and Currency that, under the pre-emption provision, **'no State law would be preempted unless compliance would involve a violation of Federal law.'** S.Rep., 91-517, 91st Cong., 1st Sess. 8 (November 5, 1969)."

*Cisneros, supra,* 39 Cal.App.4th at 578 (bold added).

Other decisions are in accord with *Cisneros.* For example, in *Gomon v. TRW, Inc.,* 28 Cal.App.4th 1161 (4th Dist. 1994), the court stated:

> "Under the Supremacy Clause of the United States Constitution, if state law is in direct conflict with federal law **such that compliance with both is impossible or the state law is an obstacle to the accomplishment of the full purposes and objectives of Congress,** the state law is preempted. (*Silkwood v. Kerr-McGee Corp.* (1984) 464 U.S. 238, 257, 104 S.Ct. 615, 621, 78 L.Ed.2d 443, 458; 7 Witkin (9th ed. 1988) Summary of Constitutional Law, § 7, p. 49.) However, the CCRAA does not conflict with the FCRA, nor is it an obstacle to its purposes and objectives."

*Gomon, supra,* 28 Cal.App.4th at 1173-74 (bold added).

In the present case, there is no preemption because the allegations arise out of Discover's role as a debt collector, rather than as a furnisher of credit information. Under Rosenthal, the definition of "debt collector" includes not only third-party debt collectors, but any person who collects "on behalf of himself or herself." *Civil Code* § 1788.2(c).

## E. DEFENDANT'S ESTOPPEL ARGUMENT UNDER THE FAIR CREDIT BILLING ACT FAILS.

19

1   State . . . except to the extent that those laws are inconsistent with any provision of

2   this subchapter, and then **only to the extent of the inconsistency.**" 15 U.S.C. §

3   1681t(a) (bold added). Sections 1788.18 and 1798.93 are not inconsistent with the

4   FCRA.

5   "Preemption analysis . . . generally begins with a presumption against

6   preemption, that is, 'with the assumption that the historic police powers of the States

7   were not to be superseded by the Federal Act unless that was the clear and manifest

8   purpose of Congress.'" *Sanai v. Saltz*, 170 Cal.App.4th 746, 772 (2nd Dist. 2009),

9   quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed.

10  1447 (1947).

11  Any provisions of Rosenthal would only be preempted to the extent that

12  compliance with them would result in *violation* of the FCRA. *Cisneros v. U.D.*

13  *Registry, Inc.*, 39 Cal.App.4th 548, 578 (2nd Dist. 1995). Although the court in

14  *Cisneros* was analyzing preemption of the CCRAA by the FCRA, the court's broad

15  language applies equally to Rosenthal:

16  "In enacting FCRA, Congress did not attempt to reserve to itself all
    efforts to regulate the consumer reporting business. (See 15 U.S.C. §
17  1681t ['This subchapter does not annul, alter, affect, or exempt any
18  person subject to the provisions of this subchapter from complying with
    the laws of any State with respect to the collection, distribution, or use of
19  any information on consumers, except to the extent that those laws are
20  inconsistent with any provision of this subchapter, and then **only to the
    extent of the inconsistency.'**]; *Credit Data of Arizona, Inc. v. State of*
21  *Ariz.* (9th Cir.1979) 602 F.2d 195, 197.) **California is not foreclosed
22  from enacting greater protections for consumers** injured by the
    activities of reporting agencies. . . . Under the Supremacy Clause, state
23  law is preempted only if it 'is in direct conflict with federal law **such
24  that compliance with both is impossible,** or the state law is an obstacle
    to the accomplishment of the full purposes and objectives of
25  Congress....' (*Gomon v. TRW, Inc.* (1994) 28 Cal.App.4th 1161, 1173,
26  34 Cal.Rptr.2d 256; accord *Doyle v. Board of Supervisors* (1988) 197
27  Cal.App.3d 1358, 1363, 243 Cal.Rptr. 572.) The remedies afforded to
    injured consumers by CCRAA are not inconsistent with, but are in
28  addition to, remedies provided by FCRA."

18

1    Defendant ignores the CCRAA standard and focuses on only one of several
2    aspects of the FCRA in section 1681s-2(a). Defendant refers to the term "reasonable
3    cause to believe that the information is inaccurate," which is defined in the FCRA to
4    means "having specific knowledge, other than solely allegations by the consumer, that
5    would cause a reasonable person to have substantial doubts about the accuracy of the
6    information." 15 U.S.C. § 1681s-2(a)(1)(D). While the facts here show that standard
7    as met (see Plf. Fact Nos. 10 – 45), the FCRA also has the standard from section
8    1681s-2(a)(1)(B), which prohibits reporting after notification of an inaccuracy, if the
9    information is inaccurate.

10    Although the CCRAA standard "knows or should know" is applicable here, the
11    information reported was inaccurate under any of the standards suggested.  There is
12    ample evidence that Discover knew or should have known the information being
13    reported was inaccurate. (See Plf. Facts Nos. 10 – 45.)

14

15    **D. <u>DISCOVER VIOLATED THE CALIFORNIA IDENTITY THEFT</u>**
16    **<u>LAW AND THE CALIFORNIA ROSENTHAL FAIR DEBT COLLECTION</u>**
17    **<u>PRACTICES ACT.  THE APPLICABLE PROVISIONS OF THESE</u>**
18    **<u>STATUTES ARE NOT PREEMPTED BY THE FCRA.</u>**

19    Defendant argues in its summary judgment motion that Plaintiff's Rosenthal
20    and Identity Theft Law causes of action are preempted by the FCRA.  Plaintiff's
21    Rosenthal claim is brought under the identity theft provision of that Act, *Civil Code* §
22    1788.18, which requires that a debt collector cease collection activities upon being
23    properly notified that the debt arises from identity theft. Plaintiff's Identity Theft Law
24    claim is brought under *Civil Code* § 1798.93, which provides remedies against a
25    claimant which failed to diligently investigate an identity theft victim's claim. These
26    provisions are not preempted.

27    The FCRA provides that it "does not annul, alter, affect, or exempt any person
28    subject to the provisions of this subchapter from complying with the laws of any

1  P&As, p. 12, line 12 – p. 13, line 13.) In these two cases, the plaintiffs did not provide

2  any factual evidence relating to the unreasonableness of the reinvestigations, but relied

3  upon their own hunches. *Chiang, supra,* at 38; *Stroud, supra,* at 1314. There is no

4  indication in either case that those plaintiffs provided the court with an expert's report,

5  as is the case here. (Plf. Facts Nos. 10 – 45.) Here, unlike *Chiang* and *Stroud*, there is

6  ample evidence that Discover failed to conduct a reasonable investigation, including

7  an expert's declaration. (Plf. Facts Nos. 29 – 43.)

8       In addition to *Chiang, supra,* Discover cites Discover relies upon *Collins v.*

9  *BAC Home Loans Servicing LP*, 912 F.Supp.2d 997, 1011-12 (D. Colo. 2012) .

10  *Chiang* and *Collins* do not involve identity theft situations.  For an identity theft

11  situation, a more thorough investigation is needed. *King, supra.*

12

13             **2. Discover Reported Inaccurate Information.**

14       Discover argues that it did not improperly report inaccurate information.

15  Referring to the summary judgment motion, defendant relies upon its fact nos. 20 –

16  23, 25, 31 & 34 for its argument. Each of these facts is disputed.  As seen in fact nos.

17  10-28 and 44 & 45, above, there is ample evidence that DISCOVER reported

18  inaccurate, false, incomplete or unverified information.

19

20       **B. <u>DEFENDANT VIOLATED THE CALIFORNIA CONSUMER</u>**

21  **<u>CREDIT REPORTING AGENCIES ACT ("CCRAA").</u>**

22       Defendant argues that the standard under the FCRA, 15 U.S.C. § 1681s-

23  2(a)(1)(D), should be applied to the CCRAA. (Def. P&As, p. 16, lines 7 – 20.) The

24  standard under the CCRAA is: "A person shall not furnish information on a specific

25  transaction or experience to any consumer credit reporting agency if the person **knows**

26  **or should know** the information is incomplete or inaccurate." *Civil Code* §

27  1785.25(a) (bold added).

28

PLAINTIFF'S MEMO OF CONTENTIONS OF FACT AND LAW

1

2        **A. FAIR CREDIT REPORTING ACT: Discover Failed to Conduct a**

3        **Reasonable Investigation as Required by the FCRA.**

4      Discover argues that Plaintiff cannot show that it failed to conduct a reasonable

5 investigation. Discover never undertook an account reconciliation (Plf. Fact No. 30),

6 ignored the wealth of information made available by Mary Peters (Plf. Fact No. 32),

7 did nothing in response to the ACDV which specifically identified the fraud (Plf. Fact

8 No. 38), forced Mary Peters to deal with over 80 customer service representatives who

9 each provided inconsistent handling and merely "passed the buck." (Plf. Fact No. 42.)

10 Plaintiff's expert, Thomas Tarter, discusses the investigation, calling it unreasonable,

11 reckless and willful. (Plf. Facts Nos. 31 – 42.)

12      Discover's rendition of the law applicable to the "reasonableness" of the

13 investigation is inaccurate because it is incomplete. (Def. Summary Judgment P&As,

14 p. 11, line 24 – p. 12, line 27.) The court in *Johnson v. MBNA America Bank, N.A.*,

15 357 F.3d 426, 430-31 (4th Cir. Va. 2004) noted that an investigation is "**a detailed**

16 **inquiry** or **systematic examination**," and for purposes of the FCRA, "requires some

17 degree of **careful inquiry**," not a "superficial" one. (Bold added.) A section 1681s-

18 2(b) investigation "requires an inquiry likely to turn up information about the

19 underlying facts and positions of the parties, not a cursory or sloppy review of the

20 dispute." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155 (9th Cir. Cal.

21 2009).

22      When the nature of the dispute concerns **fraud or identity theft**, "a more

23 thorough investigation" is warranted. *King v. Asset Acceptance, LLC*, 452 F.Supp. 2d

24 1272, 1279 (N.D. Ga. 2006), citing *Westra, supra*, 409 F.3d at 827.

25      In its summary judgment motion, defendant relies upon *Chiang v. Verizon New*

26 *England, Inc.*, 595 F.3d 26 (1st Cir. Mass. 2010) and *Stroud v. Bank of America*, 886

27 F. Supp. 2d 1308 (S.D. Fla. 2012) as examples of FCRA claims where the plaintiffs

28 could not show the investigations were unreasonable. (Def. Summary Judgment

15

---

       g.  Punitive damages for willful violations.

    ii. Violation of the Consumer Credit Reporting Agencies Act ("CCRAA"):

       a.  DISCOVER credit-reported inaccurate or incomplete credit information to one or more credit bureaus (under CCRAA, there is no requirement that a consumer "filter" his dispute through the credit bureaus first);

       b.  Plaintiff's general and special damages; and,

       c.  Punitive damages for willful violations.

    iii. Violation of the California Identity Theft Law:

       a.  Plaintiff was a victim of identity theft;

       b.  DISCOVER was a "claimant" under the Identity Theft law;

       c.  Plaintiff filed a police report and provided a copy of the police report to DISCOVER;

       d.  DISCOVER did not cancel out or otherwise rectify the losses from the identity theft after receiving the police report and the identity theft information from the plaintiff;

       e.  Plaintiff's general and special damages; and,

       f.  Punitive damages of up to $30,000 for the violation.

    iv. Rosenthal Fair Debt Collection Practices Act:

       a.  Plaintiff notified DISCOVER of the identity theft situation;

       b.  DISCOVER had specific obligations to cease all debt collection activities upon receipt of such notice;

       c.  DISCOVER continued its debt collection and negative credit reporting activities after receiving notice from the plaintiff of the identity theft situations; and,

       d.  Plaintiff's general and special damages.

Each of the statutes listed above includes attorney's fees and costs to a prevailing plaintiff.

identity theft in the past, because of Discover's mishandling of his account and the credit-reporting, has left him a spiritually broken man.

## II. LEGAL CONTENTIONS

 **A.** The following is a summary statement of the claims plaintiff has pleaded and plans to pursue:

 i. Violation of the Fair Credit Reporting Act (15 U.S.C. Section 1691s-2 (b);

 ii.   Violation of the California Identity Theft Law (Cal. Civ. Code Section 1798.93);

 iii.   Violation of the California Consumer Credit Reporting Agencies Act (Cal. Civ. Code Section 1785.25 (a) and 1785.31);

 iv.   Violation of the Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code Section 1788.17).

 a. The elements required to establish plaintiff's claims:

 i. Fair Credit Reporting Act

  a. Plaintiff had an account with DISCOVER, which DISCOVER reported to the credit bureaus;

  b. DISCOVER issued inaccurate, incomplete or unverifiable information about plaintiff's account to one or more credit reporting agencies;

  c. Plaintiff disputed the derogatory credit reporting to the credit bureaus, which in turn notified DISCOVER of the dispute;

  d. DISCOVER failed, refused or neglected to perform a reasonable reinvestigation;

  e. DISCOVER did not modify, correct or delete the false, inaccurate or unverifiable credit reporting within the statutory time;

  f. Plaintiff's general and special damages.

13

## MISHANDLING OF HIS ACCOUNT AND THE CREDIT-REPORTING OF HIS ACCOUNT.

46. Discover still owes plaintiff conservatively $15,000 to $20,000 in identity theft charges for which he paid, plus interest, penalties and late fees on those charges.

47. Fred Peters' business suffered. Fred Peters is a sole proprietor and relies upon his available credit to buy parts to service his accounts, and also to pay his assistant mechanics when collections are slow. As a result of the continuous negative credit reporting and account mismanagement by Discover, Fred Peters' available credit dried up. He was denied a cared card from US Bank because of his credit report. He was unable to hire on additional workers to service his accounts. He became unable to buy replacement parts and tools on credit, which he had always done before Discover began the negative credit reporting. At 75 years old, he has to now service all of his clients' needs by himself, forcing him to work 7 days a week, 12 hours a day.

48. Fred Peters detailed over $200,000 in economic losses, caused in whole or in substantial part by Discover's actions, in a series of interrogatory responses.

49. Tom Tarter also calculated that Mr. Peters' inability to hire on mechanics to help him service accounts has cost him business and profits in the approximate sum of $216,720.00.

50. In addition, Fred Peters is now a broken man as a consequence of his inability to extricate himself from this identity theft. It has now been going on for three years, and Discover has relentlessly continued to bollix up the account and issue false negative credit information about him. He has had severe bouts of sleeplessness. He is often depressed. He is now confused more easily, and much more forgetful. He now suffers from high blood pressure, whereas he did not before the identity theft. He is frequently tired and lethargic. His inability to put this

1  representatives have done, and each one tries to "pass the buck" down the line

2  because each one lacks either the ability or the discretion, or both, to resolve the

3  issue.

4      43. Discover was still reporting Fred Peters as late on his bill to DISCOVER as

5  recently as August 26, 2013.

6

7  **TOPIC 7: PLAINTIFF DOES NOT OWE DISCOVER FOR ANY OF**

8  **THE LEGITIMATE CHARGES HE MADE ON THE CARD; IF**

9  **ANYTHING, DISCOVER OWES PLAINTIFF BECAUSE DISCOVER**

10  **HAS FAILED TO SUBTRACT OUT ALL OF THE IDENTITY THEFT**

11  **CHARGES AND THE INTEREST, PENALTIES AND LATE CHARGES**

12  **WHICH ACCRUED ON THE IDENTITY THEFT CHARGES.**

13

14      44. Mary Peters performed an account reconciliation on her own, after

15  Discover failed to perform one.  She arrived at the conclusion that Discover owes

16  Fred Peters conservatively $15,000 to $20,000 for unforgiven identity theft charges,

17  along with interest, penalties and fees on those charges of which Discover credited

18  Plaintiff for less than $2,000.  Bear in mind, Rebecca Markham used Fred Peters'

19  money to pay for her identity theft charges, and Discover has never fully re-credited

20  these sums back to Fred Peters.

21      45. While Fred Peters admits that he made some legitimate charges on the

22  Discover card after he reported the identity theft, these were relatively small, and he

23  only stopped making payments after Discover advised Mary Peters to stop making

24  payments pending the identity theft investigation.  Even subtracting out the legitimate

25  charges which Fred Peters made, Discover still owes Fred Peters conservatively

26  $15,000 to $20,000 in Markham fraudulent charges, and the interest and late fees.

27  **TOPIC 8: FRED PETERS SUFFERED BOTH ECONOMIC AND NON-**

28  **ECONOMIC DAMAGES AS A CONSEQUENCE OF DISCOVER'S UTTER**

39. Discover did not provide in discovery, nor in its summary judgment motion, any witness who actually participated in the reinvestigation.  Discover produced for deposition a corporate witness, Maria Micione, who *had no personal knowledge whatsoever* of the so-called reinvestigation.

40. There is *no evidence whatsoever* that Discover considered at all the abundant information that Mrs. Peters had provided to it about the identity theft and the identity theft charges.  Failing or refusing to consider evidence which is readily available during a reinvestigation under FCRA is *unreasonable.*

41. A reinvestigation is not necessarily bounded by the short coded synopsis of the dispute as contained in the ACDV form from the credit bureaus.  All major banks and creditors know that the ACDV forms are very, very abbreviated, and it is often necessary to go outside of the ACDV abbreviated statement to conduct a reasonable reinvestigation.  What is a reasonable reinvestigation is defined by the circumstances, and, under banking industry standards, it is widely recognized that a reasonable reinvestigation often has to look beyond the short, abbreviated version of the dispute as given in the ACDV forms.

42. Evidence of the circus atmosphere at Discover is the fact that Mary Peters called Discover over 80 times about her dispute *and had to deal with 80 or more customer service representatives!*  She had to explain her dispute anew each and every time, which led to untold frustration.  Each customer service representative would tell her something different and would do something different.  Some representatives reversed charges; some added charges back; some took charges off; some added back charges which had previously been taken off, with no explanation.  *There is no evidence in this case of a consistent, methodical handling of the plaintiff's identity theft situation, overseen by a single or small number of responsible and competent individuals, which is what a reasonable reinvestigation would have required in this case.*  Instead, Mary Peters is treated to a "boiler room" call center where each new representative has little or no information about what the past

35. Credit-reporting plaintiff for payments not made when Discover's own fraud department instructed Mary Peters to cease making payments pending the outcome of the fraud investigation is both *unreasonable* and *reckless and willful.*

36. Conducting a so-called "reinvestigation" while *repeatedly ignoring* the abundant information it had immediately at its disposal constitutes a *willful and reckless* violation.  The Peters did far, far more than should be expected of any identity theft victim.  Discover's utter refusal to put a responsible person, or a responsible team, in charge of reconciling the account and rectifying the identity theft situation, when Discover had at its fingertips abundant information and a very willing victim's wife to participate in the reinvestigation, is sheer recklessness and is inexcusable.

37. The ACDV forms which Discover received from the credit bureas alerted Discover to the identity theft and to the existence of fraudulent charges.  The Equifax ACDV referred to "identity fraud" and indicated that "Consumer sent police report from Riverside County," and went on to give the date of the report and the reporting officer.  The police report included a long list of many of the fraudulent charges.  A reasonable reinvestigation at this point would have been to obtain a copy of the police report and not just to confirm the identity of the person that opened the account, which is all that Discover bothered to do.

38. The EXPERIAN ACDV was even more specific: "Claims account takeover, *fraudulent charges made on account…Former secretary embezzled money and committed ID theft.  She used the card and made fraudulent charges without permission."*  Here, there is positively no disputing that Experian put Discover on notice of the fraudulent charges made on the account.  However, per Discover's own statement of facts, all it did was verify the identity of Fred Peters.  ***DISCOVER did nothing in response to this ACDV to identify or otherwise rectify the fraudulent charges.***  This renders its reinvestigation *unreasonable.*

9

30. Here, Discover's reinvestigation suffered from a fatal flaw at the outset: Discover had never undertaken the account reconciliation required to determine the accurate amount which Fred Peters owed on his Discover account, if he owed any amount.  In this case, the first step of any reasonable reinvestigation would have been a thorough account reconciliation, dating back to the beginning of the identity theft in 2006.

31. Continuing to credit-report plaintiff when Discover had either failed or refused to perform a full account reconciliation constitutes a *willful and reckless* violation of the applicable credit reporting laws.

32. Discover also claims that its only obligation on reinvestigation is to myopically look at the abbreviated statement on the Automated Consumer Dispute Verification form ("ACDV") issued by the credit bureaus, in this case, Experian and Equifax.  However, Discover had a *wealth* of information available from Mary Peters and available from the law enforcement agencies investigating the identity theft. Mary Peters in fact provided Discover with extensive documentation and her own accounting showing the fraudulent charges.  For Discover to ignore this information, which it had in its possession or which was readily available to it, in the course of its reinvestigation, was positively *unreasonable.*

33. It was also *unreasonable* for Discover to add the charged-back fraud charges back onto the new credit card, and then fail or refuse to inform the Peters that this explained the account balance which appeared on the new card.  If its reinvestigation failed to uncover, and then subtract, these added-back fraud charges, then the investigation was *unreasonable.*

34. As stated above (Fact No. 28), Discover continually credit-reported varying amounts to credit bureau Experian.  This alone was sufficient notice to Discover of the inaccurate, incomplete and unverifiable credit reporting, and failing to rectify this erratic and unverified pattern of credit reporting itself is *unreasonable.*

## TOPIC 4: DISCOVER CREDIT-REPORTED THE PETERS FOR LATE PAYMENTS WHEN DISCOVER TOLD THE PETERS NOT TO MAKE PAYMENTS BECAUSE AN IDENTITY THEFT INVESTIGATION WAS ONGOING.

26. Mary Peters spoke to the Discover fraud department about the identity theft situation. Representatives from the Discover fraud department advised Ms. Peters not to make payments until after their investigation was completed.

27. Discover then credit-reported plaintiff for not making payments. Discover never advised Mary Peters that it had completed its investigation and that she should resume payments.

## TOPIC 5: DISCOVER'S CREDIT REPORTS WAS ERRONEOUS ON ITS FACE

28. Discover Bank continually reported different balances to credit bureau Experian, and the different amounts had no relation to any of Fred Peter's monthly charges or payments. These wildly varying payment amounts alone should have been noticed to Discover that the credit reporting was inaccurate, incomplete and unverifiable.

## TOPIC 6: DISCOVER'S REINVESTIGATION WAS SERIOUSLY FLAWED, AND ITS HANDLING OF THIS ACCOUNT IN GENERAL WAS WELL BENEATH THE INDUSTRY STANDARD.

29. The standard in the industry for credit reporting, which is also the legal standard, is that a furnisher of credit information (here, Discover) cannot credit-report information which it learns on reinvestigation to be inaccurate, incomplete or unverifiable.

7

1    identity theft charges *which it knew to be identity theft charges.*  Here is how this
2    happened:

3        a.  Rebecca Markham would pay the Discover bills, inflated by identity theft
4           charges, out of Fred Peters' Bank of America checking account.

5        b.  Mary Peters identified for Bank of America the amount of money from the
6           Bank of America account which had been used to pay for fraudulent
7           charges.  Bank of America re-credited Fred Peters for that amount.

8        c.  Bank of America then charged back Discover Bank for this amount, as is
9           not an uncommon practice between banks in an identity theft situation.

10       d.  Discover Bank paid the Bank of America charge-back.

11       e.  *However, then Discover Bank put the amount of what it had paid to Bank of*
12          *America as a new charge onto plaintiff's new Discover credit card!*  In
13          other words, Discover Bank charged plaintiff for what it had had to pay
14          Bank of America because of the identity theft against the plaintiff.
15          Discover then continued to charge interest, penalties and late fees on top of
16          these fraudulent charges.

17       25. It is positively beneath any industry standard for a credit card company to
18   charge back to a consumer what the credit card company has had to pay in charge-
19   backs to a bank because the consumer has been the victim of an identity theft.  Banks
20   deal with the risks of identity theft through insurance and through the pricing of their
21   products.  Consumers generally do not have these resources.  When a bank has to re-
22   credit money to a consumer, or has to cancel credit charges, because of an identity
23   theft against the consumer, the bank is in a far better position to either make an
24   insurance claim or to write it off to profit & loss.  The consumer, and particularly
25   Fred Peters, usually faces catastrophic consequences if he is forced to pay the
26   identity theft charges.

27

28

20. At one point, a representative named Mr. R. Jacks from Discover recognized the magnitude of the identity theft, and also recognized that Discover had charged substantial interest, late fees and penalties on identity theft charges. He advised Mary Peters that Discover would zero out the account altogether. However, when Mary Peters called back to Discover to follow up, Mr. R. Jacks no longer worked in that department and she could not get a hold of him. Plaintiff would have been satisfied at that time if the account had just been zeroed out.

21. Mary Peters finally performed the account reconciliation that Discover failed or refused to perform. By her calculations, Discover owes Fred Peters conservatively $15,000 to $20,000 in Markham's fraudulent charges, and interest and late fees.

## TOPIC 3: DISCOVER ADDED CHARGES WHICH IT KNEW TO BE IDENTITY THEFT CHARGES BACK ONTO PLAINTIFF'S CREDIT CARD, AFTER IT HAD TAKEN THEM OFF, AND THEN CONTINUED TO CHARGE PENALTIES AND INTEREST ON THE IDENTITY THEFT CHARGES.

22. In response to the identity theft, Discover failed to close out plaintiff's old credit card when it opened a new Discover card for plaintiff. The new Discover card initially opened with a zero balance. The old account number ended in 0789, while the new account ended in 2476.

23. After Discover opened up the new card, Discover placed over $5,000 in charges onto the new "2476" card, which Mary Peters did not understand. Discover also continued to place charges onto the old "0789" card. Mary Peters called Discover repeatedly to try to find out the source of these new charges, but Discover never provided her with an answer.

24. It was not until after plaintiff filed this lawsuit that plaintiff finally discovered where these new charges had come from: Discover billed plaintiff for

5

15. In this case, Discover Bank *never* specifically identified all of the identity theft charges.  Discover's own corporate witness, Maria Micione, testified that Discover could only "ballpark" the amount that it believed Fred Peters still owed on the credit card.  In response to the identity theft, DISCOVER did create a new account, the "2476" account, but failed to close out the old "0789" account.  Ms. Micione did not know if any of the fraud charges, or interest and penalties on the fraud charges, were transferred from the old "0789" account to the new "2476" account, and admitted that the balance that was transferred between these accounts was not correct.

16. Discover Bank refused to go back earlier than 2008 to identify identity theft charges, although Mary Peters specifically advised DISCOVER that the identity theft had begun in 2006.

17. Without going back to the inception of the identity theft, it would be impossible for any bank to accurately identify, and cancel, all of the identity theft charges, as well as any interest or penalties deriving from the identity theft charges.

18. It is well-established industry standard that a bank or credit card company does not bill a consumer based on an "ballpark" estimate.  The bank or credit card company must exactly add up all legitimate charges, late fees, interest and penalties, and likewise back out any charges, late fees or penalties deriving from identity theft charges.  Only when the bank or credit card company has done this can it present a true bill to a consumer.  Until the bank or credit card company presents a true bill, the consumer is within his or her rights to challenge the bill.  Here, Discover's "ballpark" was based on four months of activity: December 2010 through March of 2011, and neglected the preceding four years, going back to when the identity theft started in 2006.

19. Here, Discover never presented a true bill to Fred Peters following the identity theft.  It never performed a full reconciliation back to the beginning of the identity theft to determine what was actually owed, if anything.

any new information, she would provide it to Discover.  Ultimately, Mary Peters determined that the identity theft scheme had been going on since 2006.

## TOPIC 2: DISCOVER NEVER RECONCILED THIS ACCOUNT AND NEVER PRESENTED AN ACCURATE BILL TO THE PETERS FOLLOWING THE IDENTITY THEFT

10. Discover has never contested the industry standard that it should re-credit plaintiff for money stolen through the identity theft.  This is the standard of the industry.

11. The situation here is an identity theft.  Some of the participants have referred to it as an "account takeover," and others have referred to it as "embezzlement," but it has always been an identity theft: Rebecca Markham stole the identity of Fred Peters and used his identity fraudulently and without his permission to engage in financial transactions for her own benefit, using plaintiff's money or credit.

12. In identity theft situations, it is often not possible for the consumer to realize the identity theft within a 60- or 90-day period.  Some identity thefts, such as this one, are sophisticated and can go on for years undetected.

13. Where the identity theft has gone on for years, undetected, and where the consumer is not complicit in the identity theft, it is the industry standard to do two things: first, the bank/creditor works with the consumer to specifically identify all of the fraudulent charges, going back to the beginning of the identity theft.  Second, the bank cancels any identity theft charges, and also cancels any interest, penalties or late fees arising from those charges.

14. Discover does not contend that Fred Peters was in any way complicit in the identity theft.

3

identity theft in November of 2010, Fred Peters had between two and four junior mechanics to help him service his customers.  He had an established book of business including several large farms and ranches in the Nuevo area.

5. When Fred Peters learned of the identity theft, he simultaneously discovered that he had almost no money in his accounts.  Unable to afford them, he laid off his junior mechanics and began servicing all of his accounts by himself.  At over 70 years old, he began working 10- 12-hour days, seven days a week, just to survive.

6. It is unlikely that Fred Peters would have uncovered the identity theft by reviewing the Discover or the Bank of America monthly statements.  The Discover monthly statements often were doctored by Rebecca Markham to conceal her identity theft.  Fred would cut checks to Discover to pay for his charges, which checks Rebecca Markham would then hide or destroy and then make much larger payments to Discover online, using Fred Peters' Bank of America savings account.  All in all, Rebecca Markham would consistently doctor the records which Fred Peters would see, or conceal them, so that he would never see the true statements or account balances.  Fred Peters would never see Rebecca Markham's online activity because Fred Peters never went online and did not use the internet.

7. Fred Peters had neither the time nor the training to resolve the identity theft situation after it occurred, so his wife, Mary Peters, took over and began trying to straighten out the situation.

8. Mary Peters immediately contacted the police, and provided the police with all information she had about the identity theft.  She obtained a police report, along with supplements to the original report, and provided them to Discover and to the credit bureaus.

9. Because the identity theft scheme was sophisticated, Mary Peters did not uncover the full range of the identity theft for several months.  As she uncovered more and more details, she would provide them to the police and with the creditors who were continuing to collect on identity theft charges.  As soon as she uncovered

## I. **PLAINTIFF'S CONTENTIONS OF FACT**

Plaintiff has arranged his contentions according to the topics likely to be litigated during the trial.  References to exhibits, declarations or depositions refer to the exhibits, declarations and depositions plaintiff filed in opposition to DISCOVER'S motion for summary judgment.

## TOPIC 1: THE IDENTITY THEFT

1. The identity theft scheme hatched by Rebecca Markham was sophisticated. She created falsified Discover bills so that Fred Peters would not notice discrepancies.  She did transactions and made payments online to avoid Fred Peters' notice.  She created bogus checks, which Fred Peters would sign, only to be replaced by checks she signed fraudulently to make payments.  All in all, the scheme was sophisticated and specifically designed to prevent Fred Peters from learning of the identity theft with normal diligence and scrutiny.  Only extraordinary diligence and scrutiny would have discovered it at an earlier date.

2. Fred Peters is presently 75 years old and was in his early 70's at the time of the identity theft.  He does not use the internet for any of his financial or credit transactions.  He is generally unfamiliar with how the internet works.

3. Fred Peters is a truck and heavy equipment repair mechanic.  Other than mechanic's training, he has no education beyond high school and no formal training in running an office or in managing business financial matters.  He has been delegating the administrative portion of his business to others for years.

4. Being a truck and heavy equipment repair mechanic in Nuevo, Ca. (agricultural area of Riverside County) is a seven-day-a-week job, because farmers and ranchers need to have equipment up and running continuously to care for their farm animals and livestock and to tend to their crops.  Before he discovered the

1

Robert F. Brennan, Esq. [S.B. #132449]
**LAW OFFICES OF ROBERT F. BRENNAN, A P.C.**
3150 Montrose Ave.
La Crescenta, CA 91214
Tel. (818) 249-5291
Fax (818) 249-4329
Email: rbrennan@brennanlaw.com

Attorney for Plaintiff
FRED J. PETERS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRED J. PETERS,<br><br>            Plaintiff,<br><br>   vs.<br><br>EQUIFAX INFORMATION SERVICES LLC, et al.,<br><br>            Defendants. | Case No.: EDCV 12-01837-TJH(OP)<br>Hon. Terry J. Hatter, Jr.<br>Courtroom 17<br><br>**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW.**<br><br>Pre-Trial Conference: Dec. 9, 2013<br>Time:  10:00 a.m.<br>Courtroom:  17 |